Matter of Higginbotham (2025 NY Slip Op 02203)

Matter of Higginbotham

2025 NY Slip Op 02203

Decided on April 16, 2025

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 16, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
ANGELA G. IANNACCI, JJ.

2019-03029

[*1]In the Matter of George A. Higginbotham, a suspended attorney. Grievance Committee for the Second, Eleventh, and Thirteenth Judicial District, petitioner; George A. Higginbotham, respondent. (Attorney Registration No. 4268736)

The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on February 16, 2005. By decision and order on motion dated December 6, 2019, the respondent was suspended immediately from the practice of law pursuant to Judiciary Law § 90(4)(f) and 22 NYCRR 1240.12(c)(2)(ii) as a result of his conviction of a serious crime. By the same decision and order, the respondent was directed to immediately apprise this Court upon his sentencing and to simultaneously file with this Court a certified record of the judgment of conviction. By order to show cause dated December 21, 2023, the respondent was directed to show cause why a final order of suspension, censure, or disbarment should not be made based upon his conviction of a serious crime.

David A. Chandler, Brooklyn, NY (Sara Mustafa of counsel), for petitioner.
George A. Higginbotham, Great Falls, Virginia, respondent pro se.

PER CURIAM.

OPINION & ORDER
On November 19, 2018, an information was filed in the United States District Court for the District of Columbia, charging the respondent with one count of conspiracy to make false statements to banks. Specifically, the respondent was charged with knowingly conspiring and agreeing with others, known and unknown, including coconspirator A and coconspirator B, to knowingly make false statements for the purpose of influencing federally insured financial institutions upon any application, in violation of 18 USC §§ 371 and 1014. On November 30, 2018, in the United States District Court for the District of Columbia, before the Honorable Colleen Kollar-Kotelly, United States District Judge, the respondent pleaded guilty to count one of the information and his sentencing was delayed due to his cooperation with the prosecution.
The facts of the respondent's criminal conduct are as follows: In or about April 2017 to in or about January 2018, while employed as an attorney by the United States Department of Justice (hereinafter DOJ), the respondent was involved in a conspiracy to influence the DOJ's prosecution of forfeiture complaints against Jho Low, a foreign national who orchestrated a multibillion dollar embezzlement and bribery scheme from 1Malasysia Development Berhad (hereinafter 1MDB), a strategic investment and development company wholly owned by the government of Malaysia. In or about March 2017, Prakazrel Michel, a businessman, entertainer, and former member of the musical group Fugees, approached the respondent, a long time associate, to assist in finding someone with political influence who could resolve Low's issues regarding the DOJ's investigation. Low retained the services of Elliot Broidy, a non-lawyer political fundraiser [*2]and financier, to lobby government officials to attempt to resolve the 1MDB investigation. Broidy did not want to be paid directly by Low. At Michel's direction, the respondent prepared various retainer and consulting agreements that created pass through-entities to hide payments from Low to Broidy. According to the written agreements, Low would pay Broidy tens of millions of dollars for Broidy to lobby United States government officials to drop all civil and/or criminal matters related to 1MDB.
In or about May 2017, Michel informed the respondent that Low had another request that was potentially more lucrative than their work on 1MDB. Guo Wengui was a former resident of China who had publicly criticized Chinese leadership and was temporarily residing in the United States. Low wanted to persuade the United States government to send Wengui back to China before critical upcoming political events in China. In or about July 2017, Michel requested that the respondent meet with China's ambassador at the Chinese embassy in Washington D.C. to deliver a message. The respondent agreed and met with the Chinese ambassador on July 16, 2017. The respondent informed the Chinese ambassador that the respondent was meeting with the ambassador in the respondent's personal capacity and not as a representative of the DOJ, and that the United States government was working on returning Wengui to China.
Between in or about May 2017 and in or about September 2017, tens of millions of dollars were transferred from Foreign Company L, an entity formed in China, to accounts in the United States controlled by Michel. The respondent knew that the funds were from Low and for the purpose of influencing United States government officials concerning the 1MDB matters and the removal of Wengui. Approximately $100 million dollars in payments were made.
To make the international fund transfers appear legitimate, the respondent prepared various fake loan documents, investment agreements, and consulting contracts at the direction of Michel. The respondent understood that financial institutions in the United States could have refused to transact any funds involving Low. The respondent drafted the documents in the names of several foreign and domestic shell companies designed to conceal the source and purpose of the funds in case the banks and other authorities made inquiries.
In or about September 2017, the respondent flew with Michel to meet Low in Macau, China. Over several days, the parties discussed strategies for secretly funneling more of Low's funds into the United States to further the lobbying campaign. Eventually, Low proposed giving the respondent power of attorney over the assets of a company formed in China. In the event that Wengui was successfully returned to China, the respondent, using his power of attorney authority, could sell the company to Michel and Broidy, who could use that company's assets as compensation for their lobbying efforts. The respondent agreed to this arrangement and signed various documents in Macau to gain control over the foreign company.
When Michel and the respondent returned to the United States, they learned that Broidy was dissatisfied with the payment scheme. In or about October 2017, Michel and the respondent agreed that Low would deposit funds into the respondent's escrow account pending resolution of Wengui's deportation.
On or about October 23, 2017, approximately $41 million dollars were deposited into the respondent's escrow account at the direction of Low. At the direction of Michel, the respondent disbursed several million dollars for Michel's entertainment projects, representing Michel's cut in the lobbying scheme.
Between in or about September 2017 and in or about December 2017, the respondent made several false statements to three federally insured financial institutions regarding tens of millions of dollars transferred from the foreign companies into accounts in the United States. Between in or about July 2017 and September 2017, Financial Institution X sent inquiries to Michel, Michel's money manager, and the respondent concerning the source and purpose of tens of millions of dollars transferred from a foreign company into Michel's business account. The respondent sent a detailed written response to Financial Institution X, claiming that the foreign company sent funds to finance Michel's "entertainment matters" and to resolve a highly complex civil litigation. To further his false explanation, the respondent attached one of the fake consulting contracts to his written response. On September 28, 2017, Financial Institution X informed Michel that his accounts would be closed.
In or about December 2017, Financial Institution Z, where the respondent maintained an escrow account, asked the respondent about the source and purpose of a deposit of approximately $41 million dollars. The respondent falsely informed Financial Institution Z that the funds were from a foreign company for an investment in a music and entertainment project for one of the respondent's clients.
The respondent submitted two invoices totaling $70,000 for his work in this scheme, and he was paid the full amount. Michel received approximately $80 million dollars, Broidy received approximately $9 million dollars, and another coconspirator received approximately $11 million dollars. The respondent received a total of $170,000, with a portion of those funds for work unrelated to this scheme.
When the respondent was confronted by law enforcement, he immediately cooperated and continued to do so after he pleaded guilty. His cooperation substantially assisted the government in securing the convictions of Broidy and another coconspirator. The respondent also testified before the grand jury and testified at length at Michel's trial. On November 7, 2023, the respondent was sentenced, inter alia, to a period of probation of three months, and 25 hours of community service, and was ordered to forfeit $70,000.
By order to show cause dated December 21, 2023, this Court directed the respondent to show cause why a final order of discipline should not be made based upon his conviction of a serious crime. In response, the respondent submitted, inter alia, a personal statement indicating that he accepts full responsibility for his illegal conduct. The respondent also stated that he believes that Judge Killar-Kotelly gave him a second chance by imposing a light sentence in the federal case, and he is asking this Court for a second chance as well.
In view of the respondent's serious misconduct, we conclude that disbarment is warranted. While the respondent provided substantial assistance to the prosecution, he admittedly already reaped the benefit of his cooperation in that he did not receive a prison sentence for his criminal conviction. The respondent abused his status as a DOJ attorney and his privilege of being a member of the bar to entangle himself in the conspiracy to avoid prosecution and forfeiture in one of the largest kleptocracy schemes in history. The respondent used his escrow account to maintain illegitimate funds in the United States to further efforts to influence the United States government in the prosecution of Low and the deportation of a political dissident back to China. The respondent drafted false documents and repeatedly submitted them to banking institutions to perpetuate this scheme. Anything less than a disbarment is unwarranted.
LASALLE, P.J., DILLON, DUFFY, BARROS and IANNACCI, JJ., concur.
ORDERED that pursuant to Judiciary Law § 90(4)(a), the respondent, George A. Higginbotham, a suspended attorney, is disbarred, effective immediately, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, George A. Higginbotham, shall continue to comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, George A. Higginbotham, is commanded to continue to desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another; (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority; (3) giving to another an opinion as to the law or its application or any advice in relation thereto; and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, George A. Higginbotham, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Clerk of the Court